**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| HUDSON INSURANCE COMPANY, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| v. | ) | |
| | ) | Case No. 1:24-cv-544 (PTG/IDD) |
| ARCHER WESTERN FEDERAL, JV, | ) | |
| | ) | |
| *Defendant.* | ) | |

## MEMORANDUM OPINION AND ORDER

This contract dispute arises out of a project to build a new fire station at Marine Corp Base Quantico. Defendant/Counter-claimant Archer Western Federal, JV ("AWF") was the prime contractor, and Plaintiff/Counter-defendant Hudson Insurance Company ("Hudson") was the surety on a payment bond and a performance bond (the "Bonds") for one of AWF's subcontractors. Hudson's Complaint seeks a judgment declaring that its liability under the Bonds are fully or partially discharged. Dkt. 1 ("Compl.") ¶¶ 22, 26. AWF brings counterclaims for breach of contract and indemnity under the Bonds. Dkt. 10 ("Am. Counterclaim") ¶¶ 26–61. Beginning on February 18, 2025, the Court held a three-day bench trial.[1] At trial, the parties offered five witnesses and hundreds of exhibits. Following the trial, the parties submitted revised proposed findings of fact and conclusions of law. Dkts. 64, 65. Based on the evidence and witnesses presented at trial, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

[1] Before trial, AWF filed a Motion in *Limine* seeking "to exclude evidence of the collateral insurance payments" that it received. Dkt. 29 at 1. The Court indicated that it would include its decision on the Motion in *Limine* in its final ruling and does so herein. Dkts. 57, 66.

## FINDINGS OF FACT

1. On May 30, 2019, the Department of the Navy's Naval Facilities Engineering Systems Command ("NAVFAC") awarded a contract to AWF for the construction of a new fire station at Quantico, Virginia (the "Project").

2. On or about August 27, 2020, AWF entered into a subcontract (the "Subcontract") with Eastern General Contractor, Inc. ("EGC"). Under the Subcontract, EGC agreed to furnish and install "Standing Seam and Mod Bit Roofing" for the Project for a total price of $456,330.00. AWF Ex. 11.

3. The Subcontract included the following provisions:

> **1.1 Subcontractor's Work**. Subcontractor shall perform, furnish and be responsible for all work, supervision, labor, materials, layout, hoisting, tools, equipment . . . and all other things necessary for the construction and completion of the work described above, within this Agreement, and work incidental thereto in strict accordance and full compliance with the Contract Documents (the "Contract Documents" consist of this Agreement, the Prime Contract between the Owner and Contractor ("Prime Contract"), and all conditions, requirements, specifications, drawings, and addendum thereto (collectively the "Prime Contract Documents"), and all modifications to any of the Contract Documents) (collectively these requirements of the Subcontractor are referred to as either the "Subcontractor's Work" or "Contract Work"). . . .
>
> **2.1 Time is of the Essence**. Subcontractor shall proceed with Subcontractor's Work in accordance with Contractor's schedules as amended by Contractor from time to time. Contractor shall have the right to direct the sequence and pace of Subcontractor's Work, including overtime, without monetary compensation to Subcontractor. Subcontractor shall supply sufficient labor, equipment and material to enable Contractor, Owner and all other subcontractors to complete the construction of the entire Project in the time required by the Prime Contract between the Owner and Contractor. . . .
>
> **2.2 Work Schedules**. Subcontractor shall, immediately after the award of the Subcontract, prepare and submit for Contractor's information an estimated progress schedule for the Subcontractor's Work in a form acceptable to Contractor. The progress schedule shall be related to the entire Project to the extent required by Contractor and the Contract Documents and shall provide for expeditious and practicable execution of the Subcontractor's Work. This schedule shall indicate the dates for the starting and completion of the various stages of the Subcontractor's Work. The schedule shall be in writing and revised by the Subcontractor as required by the Contractor, and shall be subject to Contractor's approval. . . .

**3.2. Progress Payment Application.** The Subcontractor's progress payment application shall be submitted to the Contractor in a form and with content and documentation acceptable to Contractor and Owner.[2]

**3.11 Subcontractor Payment Failure**. In the event Contractor has reason to believe that labor, material or other obligations incurred in the performance of the Subcontractor's Work are not being, or may not be, paid, the Contractor may take any steps Contractor deems necessary to ensure that such obligations are paid and that the Subcontractor is fulfilling its obligations as trustee with respect to the payments earned under this Agreement, including, but not limited to, issuance of checks jointly to Subcontractor and the person or entity to whom Subcontractor owes an obligation, or direct payment to such person or entity . . . . Any such payments made by the Contractor shall be credited against funds otherwise due Subcontractor under this Agreement. . . .

**3.12 Right of Set Off**. Contractor may withhold and unilaterally deduct, and Subcontractor shall reimburse Contractor for, amounts otherwise due under this Agreement, or otherwise due under any other agreement in which either Contractor, Subcontractor, or any of their members, parties, owners, partners, directors, managers, or officers, has an ownership interest, sub-affiliation, or corporate affiliation ("Other Agreements"), to cover the Contractor's reasonable estimate of any costs, damages, or liability (including reasonable overhead, profit and cover), which are in any manner caused or claimed to be caused, by any act or omission of Subcontractor in connection with this Agreement or which are in any manner caused or claimed to be caused, by any act or omission of Subcontractor or its members, parties, owners, partners, directors, managers, or officers in connection with Other Agreements.

**6.2 Coordination**. Subcontractor will coordinate Subcontractor's Work with the work of Contractor, other subcontractors, and the Owner's separate contractors or employees, including any work of a design-build nature, so that no delays, obstruction, disruption or interference will occur in completion of any part or all of the Project or Contractor's work or the work of other of Contractor's subcontractors or Owner's separate contractors or employees . . . .

**7.10 Protection of the Work**. The Subcontractor shall protect the Subcontractor's Work at all times including after it is complete, and also protect the work, property or materials of the Owner, the Contractor or other subcontractors from damage caused by the Subcontractor's operations, and the Subcontractor shall have primary responsibility and liability for any damages or losses which may be incurred. If the Subcontractor causes damage to the work or property of the Owner, the Contractor or other subcontractors, the Subcontractor shall promptly remedy such damage to the satisfaction of the Contractor,

[2] Exhibit F to the Subcontract also dictated the procedures for progress payments.

or the Contractor may so remedy and deduct the cost thereof plus reasonable overhead and profit from any amounts due or to become due the Subcontractor. . . .

**8.1 Failure of Performance and Default**. If the Contractor determines at its sole discretion that the Subcontractor has: (i) refused or failed to supply enough properly skilled workers, proper materials, or maintain the schedule for the Subcontractor's Work as required by the Contractor; (ii) failed to make prompt payment for, or failed to prevent claims of non-payment from, its workers, subcontractors or suppliers of any tier . . . then the Subcontractor shall be in default of this Agreement. If the Subcontractor fails within seventy-two (72) hours after receipt of written notice (the Contractor's facsimile, email, or letter, shall constitute sufficient written notice and declaration of default) to commence and continue satisfactory correction of such default with diligence and promptness, the Subcontractor shall have materially breached this Agreement, and the Contractor, without prejudice to any other rights or remedies, shall have the right to any or all of the following remedies … (iv) withhold payment of any moneys due the Subcontractor pending corrective action to the extent required by and to the satisfaction of the Contractor, Owner, and the Architect/Engineer. . . .

**9.5 Work**. … Contractor may withhold and unilaterally deduct amounts otherwise due under this Agreement, and Subcontractor shall reimburse Contractor for, the Contractor's reasonable estimate of any costs cover, damages, or liability Contractor has incurred or may incur, which are in any manner caused or claimed to be caused, through any act or omission of Subcontractor, or in connection with Subcontractor's Work or for which Subcontractor may be responsible for under this Agreement.

4. Pursuant to the Subcontract, EGC was to "furnish and install 6 mil polyethylene and self adhered sheet membranes in accordance with the plans and specifications." Subcontract, Exhibit B.

5. Section 12.1 of the Subcontract addressed the scope of work:

**12.1 Scope**. . . . Subcontractor acknowledges that the documents included with this Agreement are incomplete and represent only the design intent. The Subcontractor assumes the risk that the Contract Documents may be defective and acknowledges that the Amount of this Agreement includes that risk. As such the pricing included with this Agreement reflects the work required for a complete and operational system in accordance with the intent of the Contract Documents and the Prime Contract. Subcontractor will coordinate throughout the design process with Contractor's design team and provide input and recommendations related to the final design to be submitted and constructed in accordance with the requirements of the Contract Documents. . . . The pricing included within this Agreement includes the final scope reflective and required of the Contract Documents and is not subject to any change orders between Contractor and Subcontractor unless the changes are made by Owner and is a Pass Through Claim,

or directed in writing by Contractor and the Subcontractor has strictly followed the requirements for a Claim.

6. On May 7, 2021, the final design drawings were issued and were consistent with communications that AWF and EGC had prior to the execution of the Subcontract. The Subcontract work included a solid membrane vapor/air barrier related to the roof.

7. The Subcontract required EGC to provide a performance bond and a payment bond according to the bond forms at Exhibit H of the Subcontract.

8. On or about November 3, 2020, Hudson executed the required Bonds. The Bonds identify EGC as the Principal and Hudson as the Surety. Each of the Bonds had a Penal Sum of $456,330.00.

9. Both of the Bonds state that AWF could recover from Hudson if EGC defaulted.

10. The payment bond defines a claimant as being, among other things, an entity "supplying labor, material, or both, used or reasonably required for use in the performance or completion of the Contract . . . ." Hudson Ex. 4. A "[c]laimant is further defined as anyone . . . hired, or which incurs expenses, to perform or complete the Principal's work . . . ." *Id.* The payment bond also provides that "[t]he Principal and the Surety hereby jointly and severally agree with the Obligee that every Claimant, including the Obligee, may sue Surety on this Bond." *Id.*

***Initial Delays and Performance Issues***

11. In June 2021, EGC commenced onsite work for the Project. Because EGC was unable to procure permanent materials, EGC started with the installation of a temporary roof.

12. On June 14, 2021, AWF questioned EGC about its lack of manpower on site and informed EGC of water damage that occurred on Friday, June 11, 2021, due to "Eastern's inability to make [a section of the Project known as] Area A watertight in a timely manner . . . ." AWF Ex.

60. The next day, AWF advised EGC that EGC's failure to cover Area A "was a very large source of water infiltration on Fridays [sic] rain event." AWF Ex. 62.

13. On July 21, 2021, EGC informed AWF that the manufacturer delayed delivery of the standing seam roofing insulation until September 15th. The standing seam roofing insulation was necessary to complete the permanent roofing work.

14. In late September 2021, AWF told EGC that EGC's "lack of manpower on site," poor communication, and failure to acquire permanent materials was impacting and delaying the Project. AWF Ex. 92 at 5-6. AWF also informed EGC that the "newly installed roof hatch appears to be leaking from the side" and "[t]here is still too much water entering the building . . . to complete interior work." *Id.* at 3.

15. On September 29, 2021, AWF issued its first "Notice of Default" to EGC due to EGC's untimeliness and delay of the permanent roofing work.

***Further Delays, Water Leaks, and Performance Issues***

16. Permanent roofing materials first arrived at the Project site in October 2021, at which point EGC began working on the permanent roof.

17. Starting in June 2021 to September 2022, there were continued water leakage issues through the roof. AWF repeatedly informed EGC of the leakage and asked EGC to repair the leak points and mitigate the water damage. At times, there were repeated leaks in the same locations.

18. As result, AWF consistently informed EGC that costs incurred by other trades, damage to their work, and delays due to the water damage would be charged to EGC.

19. Throughout this time, AWF hired other subcontractors to fix or mitigate issues caused by the water infiltration. AWF hired ADJ Gypsum Interiors to replace drywall damaged from the rain. AWF hired IR Analyzers to investigate the location and extent of moisture damage

within the roof's insulation. AWF hired Freestate Electrical to fix two light fixtures that needed to be replaced due to water damages. AWF hired Paramount Mechanical Corporation to replace duct insulation. AWF hired RW Hitt to repaint surfaces.

20. AWF also used its own labor, material, and equipment to fix damage from the water infiltration.

21. On January 26, 2022, EGC informed AWF that due to the COVID-19 pandemic, it was difficult for EGC to obtain other materials required for the permanent roof. EGC maintained that it was not responsible for these delays. AWF did not experience COVID-19 related delays when it supplied material and equipment for the Project.

22. The standing seam material, the top layer of the roof system, was not delivered to the Project until February 2022.

23. Despite EGC's inability to progress its roofing work due to the material delays, EGC advised that the masonry subcontractor could begin its work on the walls, and that it would not affect EGC's ability to install the air barrier product later. Ordinarily, the roofing subcontractor and masonry subcontractor work simultaneously so the air barrier in the walls can properly tie into the roof.

24. The masonry subcontractor finished its work before EGC began installing the roof portion of the air barrier product. Since the walls were complete, EGC could not install the air barrier product along the roof eave because "the gap between the top of the brick wall and the underside of the roof was so tight . . . ." Dkt. 62, Trial Transcript ("Tr.") Vol. 1 at 123:18-24. The product that EGC could install did not stick to the underside of the roof eave.

25. Because of these problems, AWF hired other subcontractors to help EGC complete the air barrier work. AWF hired a masonry subcontractor to remove layers of brick to allow EGC

to install the air barrier product. AWF hired Simpson, Gumpertz & Heger to perform pressure testing. AWF hired Royals Commercial to fix air/vapor barrier product around the eave of the building.

26. AWF also performed portions of the air barrier work itself.

*Performance Bond Claim*

27. On July 19, 2023, AWF submitted a final Performance Bond claim to Hudson in the amount of $591,444.55 for "costs and damages" incurred by AWF as a result of EGC's role in the water leak and air barrier issues. AWF Ex. 400. The claim asserted that AWF's "total set off costs, when a 15% overhead and profit percentage is added" equaled $977,774.55. *Id.* at 2. AWF then credited the $386,330.00 remaining Subcontract balance, arriving at a total Performance Bond Claim of $591,444.55.

28. At trial, AWF ultimately sought $1,237.04 under the Performance Bond for EGC's role in in the water leaks and air barrier issues. Dkt. 64 at 29. This number represents $390,508.74 in costs incurred and a 15% contractual allowance for overhead and profit, minus the remaining subcontract balance that was withheld by AWF and never paid to EGC.

29. EGC has a remaining Subcontract balance of $386,330.00 that AWF has not paid to EGC for their work on the Project.

*Payment Bond Claim*

30. From October 2021 to April 2022, EGC submitted five payment applications to AWF for their work on the Project. AWF rejected each application for lack of supporting documentation and incorrect calculations.

31. On May 4, 2022, the owner of EGC informed AWF that EGC could not afford to pay their suppliers or laborers because EGC had not been paid for any of its work on the Project.

32. With Hudson's consent, AWF agreed to pay EGC's suppliers directly for materials and equipment that EGC used to work on the Project.

33. On July 18, 2023, AWF submitted a Payment Bond claim to Hudson in the amount of $456,449.49 for "direct payments to various material suppliers and companies which performed work necessary to complete Eastern General's Subcontract work." AWF Ex. 312.

34. At trial, AWF sought $456,449.95 under the Payment Bond. Dkt. 64 at 29.[3]

***AWF's Builder's Risk Insurance Recovery***

35. AWF made two Builder's Risk ("BR") insurance claims to its insurer, ACE American Insurance Company ("ACE"), for damages AWF attributed to EGC: one for damages from the water leak and another for costs of the air barrier repair.

36. Michael Devaney, AWF's project manager, confirmed at trial that various items included in the bond claims were submitted to and have already been paid by BR insurance.

37. For the air barrier repair claim, ACE approved $252,841.32 in recovery. AWF received $227,841.32 for the air barrier claim after the $25,000 deductible.

38. For the water leak claim, ACE approved $353,385.03. On this claim, ACE ultimately paid AWF $253,385.03 after the $100,000 deductible.

39. In total, AWF has been paid $481,226.35 from ACE insurance for water leak and air barrier repair.

[3] At trial, AWF's consultant, Richard Ott from Milestrone Consultants, and Hudson's consultant, Christopher Herron from JS Held, offered competing testimony as to the costs attributable to EGC's conduct. Based on the Court's ultimate ruling, it does not need to resolve this conflicting testimony. *See* Conclusions of Law, *infra.*

40. AWF also submitted a claim to EGC's Commercial General Liability ("CGL") insurer to cover the deductibles AWF paid for its BR insurance claims. EGC's CGL carrier agreed to reimburse AWF for $80,000 of the $125,000 in deductibles.

41. Between ACE and EGC's CGL carrier, AWF has been paid $561,226.35 for water leak and air barrier repair costs attributed to EGC.

## CONCLUSIONS OF LAW

Hudson seeks a judgment declaring that Hudson's liability under the Bonds are, at least partially, discharged. Compl. ¶¶ 22, 26. AWF asserts counterclaims for breach of contract and indemnity. Am. Counterclaim ¶¶ 26-61.

***Applicability of the Collateral Source Rule***

As an initial matter, the Court will address AWF's arguments regarding the applicability of the collateral source rule. Dkt. 29. "The collateral source rule as previously applied in Virginia provides that 'compensation or indemnity received by a tort victim from a source collateral to the tortfeasor may not be applied as a credit against the quantum of damages the tortfeasor owes.'" *Dominion Res., Inc. v. Alstom Power, Inc.*, 825 S.E.2d 752, 754 (Va. 2019) (quoting *Schickling v. Aspinall*, 369 S.E.2d 172, 174 (Va. 1988)). Generally, damages are intended to make a plaintiff whole, not to provide a plaintiff with a windfall. *Id.* at 756. "The collateral source rule is a narrow exception to both the default rule against double recoveries and the principle that compensatory damages cannot leave a plaintiff better off than before the injury." *Id.* Under Virginia law, the collateral source rule can apply to breach of contract cases. *Id.* at 757.

Because "one who breaches a contract is liable for only those damages that would not have occurred but for the breach[,] . . . '[t]he case for the application of the collateral source rule is less compelling in a case involving breach of contract than in the case of a tort.'" *Id.* at 756 (quoting

22 Am. Jur. 2d *Damages* § 407). However, the Supreme Court of Virginia has found that the collateral source doctrine should be applied in "at least some contract cases" to "enforc[e] the parties' expectation interests in the contracts they have entered." *Id.* In applying the collateral source rule to contracts cases, the Supreme Court of Virginia endorsed the reasoning of the Court of Appeals of Arizona, which stated, "[w]hen a party has paid valuable consideration before the breach to a collateral source to insure against a loss or otherwise to protect its interest, there is no logical reason to deny that party a benefit it has paid for and grant it to another party who neither negotiated for it, paid for it, nor absorbed the opportunity costs of securing it, but who has precipitated the loss." *Id.* at 756 (quoting *John Munic Enters., Inc. v. Laos*, 326 P.3d 279, 285 (Ariz. Ct. App. 2014)). Said differently, a party that breaches a contract should not "benefit [from] a separate contract negotiated before the breach by the non-breaching party with a third party." *Id.* at 757 (quoting *John Munic Enters.*, 326 P.3d at 285).

Additionally, in contract cases, the fear of double recovery "often will prove to be more hypothetical than actual" because there is frequently "a claim of subrogation against the defendant." *Id.* (quoting *John Munic Enters.*, 326 P.3d at 286). In instances involving a claim of subrogation,

> [t]here is no double recovery . . . because the breaching defendant bears the full burden of the breach while the plaintiff receives only one award: either the collateral source, after reimbursing the plaintiff, pursues the claim against the defendant; the plaintiff pursues the claim against the defendant and repays the collateral source; or the collateral source, after reimbursing the plaintiff, obtains subrogation from the defendant.

*Id.* The Supreme Court of Virginia has held that application of the rule to contract cases "requires a case-specific determination of whether the parties' expectations . . . support the rule's application." *Id.* "The performance called for by the contract, the nature of the breach, the nature of the parties' non-contractual relationship, and the nature of the benefits in issue, and the

subrogation rights of the collateral source payor may all be relevant in determining whether to apply the collateral source rule." *Id.* (quoting 3 Dan B. Dobbs, *Law of Remedies* § 12.6(4), at 157 (2d ed. 1993)).

Applying the Supreme Court of Virginia's rule, the District of Connecticut has held that when a non-breaching party "paid full value for its excess insurance, and it received payment through that policy," the breaching party should not "receive the benefit of [the non-breaching party's] premium payments." *Dominion Res. Servs., Inc. v. Alstom Power, Inc.*, 2019 WL 3081005, at *9 (D. Conn. July 12, 2019). Accordingly, the District of Connecticut denied the breaching party's motion for summary judgment based on "the inapplicability of the collateral source rule." *Id.*

In its Motion in *Limine*, AWF argues that Hudson should not avoid liability under the Bonds because AWF received insurance payments from a third-party BR insurer. *See* Dkt. 29 at 2. AWF's subcontract with EGC required EGC to obtain bonds to secure its payment and performance. Hudson secured these bonds. AWF independently received coverage for certain losses, including losses from water leaks and for "correction of certain defective work" from a third-party insurer. Dkt. 29 at 2-3. AWF does not dispute that NAVFAC, the government entity which awarded AWF the Prime Contract, paid the cost of AWF's third-party insurance premiums as part of the price of the Prime Contract. Dkt. 54 at 3. AWF argues that it "bargained for" the benefits of the payment and performance bonds which were secured by Hudson, and the benefits of the BR insurance. *Id.*

Assessing the rule's application to contract cases, the Supreme Court of Virginia and the District of Connecticut have highlighted the importance of the party seeking to invoke the collateral source rule bargaining and *paying* for third-party insurance. *Dominion Res., Inc.*, 825

S.E.2d at 272; *Dominion Res. Servs., Inc.*, 2019 WL 3081005, at *9. AWF argues that, in the *Dominion* case, "it is likely that Dominion passed on the costs of its collateral payments to its own rate-payers." Dkt. 54 at 3. However, AWF provides no support for this proposition. Because the application of the collateral source rule is "case-specific," the Court considers which entity paid for the benefit of third-party insurance. *Dominion Res., Inc.*, 825 S.E.2d at 757. Although AWF bargained for third-party Builder's Risk insurance, it was playing with house money. NAVFAC, as part of the price for the Prime Contract, paid for AWF's third-party insurance. The collateral source rule is meant to be a narrow exception to the default rule against double recovery. An entity that does not suffer the burden of paying for third-party insurance should not be entitled to double recovery. For these reasons, the Court denies AWF's Motion in *Limine* seeking to exclude evidence of BR insurance payments to AWF.

***Breach of the Subcontract and the Parties' Liability***

Next, the Court determines the parties' liability. "[A] surety, defending an obligee's suit on the principal's bonded obligation, stands in the principal's shoes and may assert only those defenses available to the principal. Because principal and surety are in privity, the defenses available to both may be asserted by either." *Bd. of Sup'rs of Fairfax Cnty. v. S. Cross Coal Corp.*, 380 S.E.2d 636, 639 (Va. 1989) (internal citation omitted). Hudson is EGC's surety and, therefore, may assert all defenses available to EGC under the Subcontract.

Under the Bonds, AWF may only seek a claim to recover against Hudson if EGC is in default. At trial, the parties disputed whether the air barrier system was within the scope of work of the contract. The Court concludes that it was. The Subcontract specifically provided that it reflected the design intent and that EGC was responsible for coordinating the final requirements. It further provided that EGC's price was fixed, unless changes were made and paid for by

NAVFAC. The document reflected vapor barrier work, even though it was not specifically mentioned in the Subcontract, and NAVFAC never paid for any other changes. So, by the terms of the Subcontract, this work was included.

The Court concludes that EGC failed to properly perform this work and breached the Subcontract by failing to acquire the required materials, provide adequate manpower, and timely complete its work. The Court finds that AWF's witnesses credibly testified that on September 29, 2021, AWF issued a Notice of Default because of delays in EGC's work on the roof. Article 8.1 of the Subcontract between AWF and EGC provides that if, in AWF's "sole discretion," EGC "failed to . . . maintain the schedule of [EGC's] work as required by [AWF]," then Hudson, as surety, is liable for the costs that exceed any withheld subcontract balance. Hudson Ex. 1 at 11. At trial, Hudson argued that EGC's delays were due to the COVID-19 pandemic and related supply-chain shortages. However, AWF's witnesses credibly testified that when it attempted to help EGC acquire materials, AWF did not experience delays related to COVID-19 and supply-chain shortages. Under Article 8.1, it was within AWF's discretion to determine that EGC had not maintained the required schedule. Accordingly, AWF validly issued EGC a written Notice of Default.

Further, AWF is a valid claimant under the payment bond. The payment bond defines a claimant as being, among other things, an entity "supplying labor, material, or both, used or reasonably required for use in the performance or completion of the Contract." Hudson Ex. 4. A "[c]laimant is further defined as anyone . . . hired, or which incurs expenses to perform or complete the Principal's work . . . ." *Id.* Under the Bonds, EGC is the principal. The payment bond also contemplates the potential for the obligee—in this case, AWF—to be a claimant. *See id.* ("The Principal and the Surety hereby jointly and severally agree with the Obligee that every claimant,

including the Obligee, may sue Surety on this Bond . . . ."). In Virginia, "[w]here an agreement is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself." *Berry v. Klinger*, 300 S.E.2d 792, 796 (Va. 1983). At trial, AWF credibly testified that it performed certain work on the Project itself because of EGC's lack of sufficient manpower. Accordingly, to the extent that AWF self-performed work that EGC could not adequately complete, AWF is a valid claimant under the payment bond.

However, because the Court finds that the collateral source rule does not apply to the facts of the instant case, the Court concludes that AWF is not entitled to recover damages for claims for which it has already received insurance payments. AWF has received $481,226.35 from the ACE BR insurance. AWF also received $80,000 from EGC's CGL carrier to cover AWF's BR insurance deductibles. In total, AWF has received $561,226.35 for costs associated with EGC's work. Further, it is industry standard to offset remaining bond claims by any payments due under the subcontract that were withheld. At the time of trial, AWF had withheld $386,330.00 in payment due to EGC under the subcontract. Combining the amounts AWF has received from insurance payments and reimbursements from deductibles, plus payments on the subcontract balance that AWF withheld, results in a total of $947,556.35 by which AWF was compensated. The penal sum on each of the Bonds under which AWF proceeds is $456,330. Accordingly, the maximum AWF could recover under both bonds is $912,660. AWF has therefore already recovered or retained $34,896.35 more than the maximum amount it could recover under the Bonds. The Court finds that AWF is not entitled to recover under the Bonds for amounts it has recovered from BR insurance, has been credited for deductibles, or still owes to EGC. Accordingly, the Court finds that Hudson's liability under the Bonds is fully discharged.

Accordingly, it is hereby

**ORDERED, ADJUDGED, AND DECREED** that Hudson's liability under the Performance and Payment Bonds is fully discharged, and AWF is not entitled to recover under the Payment and Performance Bonds for amounts it has recovered from Builder's Risk insurance, has been credited for deductibles, and still owes to EGC; and it is further

**ORDERED** that the Clerk enter judgment in favor of Plaintiff/Counter-defendant Hudson Insurance Company pursuant to Fed. R. Civ. P. 58.

Entered this 18th day of September, 2026.
Alexandria, Virginia

/s/
Patricia Tolliver Giles
United States District Judge